UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DOUGLAS MACARTHUR GUILE,

                     Plaintiff,                        Case No. 1:12-cv-444

v.                                           Honorable Gordon J. Quist

G. BALL et al.,

                     Defendants.

_____/

## OPINION

       This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. Plaintiff has paid the entire civil action filing fee. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. § 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, Plaintiff's action will be dismissed for failure to state a claim.

## Factual Allegations

       Plaintiff Douglas MacArthur Guile presently is incarcerated with the Michigan Department of Corrections at the Baraga Maximum Correctional Facility, though the actions about which he complains occurred while he was housed at the Richard A. Handlon Correctional Facility

(MTU) and Bellamy Creek Correctional Facility (IBC).  He sues the following MTU employees: Assistant Deputy Warden G. Ball, Inspector John Kincaid and Warden John Prelesnik.  He also sues IBC Hearing Investigator (unknown) Novak.

Plaintiff alleges that, on July 25, 2009, his cell mate, Jason Elliott, admitted himself to protective custody, claiming that Plaintiff had sexually assaulted him.  Upon investigation, Elliott's allegations were found to be fabricated.  Elliott was subsequently transferred to another unit, apparently the outcome he desired when he made the false allegations.  Notwithstanding the determination that Elliott had lied, Plaintiff became labeled by officers and prisoners as a rapist. Plaintiff claims that officers not named as Defendants in this action made jokes about Plaintiff, conducted excessive cell shakedowns, and generally harassed him.  As a result, on July 31, 2009, Plaintiff asked Resident Unit Manager (RUM) Brown to transfer him because his name in the prison had been ruined and he was at risk of another cell mate making false accusations in order to get out of the unit.  Shortly thereafter, on August 3, 3009, Plaintiff filed a grievance on the subject and again requested a transfer.  On August 29, 2009, Defendant Ball conducted a grievance review.  At that time, Plaintiff told Ball that he was being harassed, that he feared for his life and safety, and that he was afraid the incident could occur again.  Plaintiff asked to be transferred and also asked that Elliott be charged for fabricating the incident.  Ball told Plaintiff that he could handle himself, that he would be fine, and that he should not make a big deal out of the incident.  In the grievance response issued September 2, 2009, Ball concluded that staff had behaved appropriately.  Ball also reported that RUM Brown questioned Plaintiff's motives for filing the grievance, suggesting that Plaintiff was merely attempting to obtain a transfer.

The following day, Plaintiff was moved to another cell with Lester Enness.  At their first meeting, Enness indicated that he was aware that Plaintiff's prior cell mate had tried to set

Plaintiff up, and he expressed sympathy.  He then told Plaintiff that he expected to be moving out soon and hoped Plaintiff would get a good cell mate.  During the next week, Plaintiff and Enness had some minor disputes about responsibilities in caring for the cell.  Enness repeatedly told Plaintiff, "Don't worry . . . I'll be out of here soon . . . ."  (Compl. at 7, docket #1, Page ID#7.)

On September 16, 2009, Enness returned to the cell before the 9:30 p.m. count.  At that time, he was noticeably drunk and high.  Plaintiff told Enness that he smelled of alcohol, and Enness indicated that he was just getting started drinking.  When the unit reopened at 10:20 p.m., Enness began going in and out of the cell and asked Plaintiff if he could borrow some "money," meaning store items that could be traded.  (*Id.*)  Plaintiff refused and told Enness that his constant opening and closing of the door was preventing Plaintiff from resting before he started his midnight work shift.  Enness again told Plaintiff that he would be moving soon, and Plaintiff replied, "Please . . . why don't you move now."  (*Id.* at 8.)  Near 1:00 a.m., when Plaintiff was performing his work assignment, he saw Enness coming down the stairs with his duffel bag.  Plaintiff, together with Officers Cheatham and Anderson, approached Enness to ask what he was doing.  Anderson told Enness, "Dude you're drunk . . . I can smell it all over you!"  Enness stated that someone on the first floor was bothering him, and he told Plaintiff that he did not want him to get involved in Enness' troubles.  After Enness was questioned, he was taken to the segregation unit.  At about 2:00 a.m., Plaintiff was escorted by four officers to a segregation cell without being told why.  He later was given a Notice of Intent to Conduct an Administrative hearing, describing the nature of the hearing as a "PREA INVESTIGATION."  (*Id.* at 9.)  Plaintiff asked what PREA meant, but he was told that it would be explained in the morning.

At approximately 11:30 a.m. the following day, Plaintiff was taken to see Acting Inspector J. Kincaid.  Kincaid asked if Plaintiff knew why he was being held.  Plaintiff told Kincaid

that he did not know, though he suspected it had to do with being questioned about Enness being intoxicated. Kincaid told Plaintiff that Enness had alleged that he was sexually assaulted by Plaintiff. Plaintiff denied the allegation, asserting that Enness was merely trying to leave the unit by the same ploy that had been used by Elliott. Plaintiff told Kincaid that Officers Cheatham and Anderson were present when Enness told Plaintiff that "he was a good bunky and that [Enness] didn't want [Plaintiff] getting involved in [Enness'] troubles." (*Id.* at 10.) Plaintiff also told Kincaid that Anderson had detected that Enness was drunk. Kincaid told Plaintiff that Enness was speaking with the Michigan State Police (MSP) and that Plaintiff would subsequently have an opportunity to do so. Plaintiff offered to provide a DNA sample and to submit to a polygraph, but Kincaid told him that would be unnecessary. From that Thursday until Monday, September 21, 2009, Plaintiff heard nothing. On that date, Plaintiff was taken from his segregation unit to the control center, where he was informed that his custody level had been increased from level 2 to level 4. Plaintiff also was given a major misconduct ticket for sexual assault. Plaintiff was then taken to a level 4 administrative segregation unit at the Bellamy Creek Correctional Facility.

Plaintiff immediately drafted a timeline and sent it to the hearing investigator. On Tuesday, September 22, 2009, Hearing Investigator Novak told Plaintiff that he had received the timeline. Plaintiff tried to explain the situation, but Novak simply gave Plaintiff some papers to complete, telling Plaintiff he would pick them up the next day. Plaintiff believed, based on Novak's attitude, that Novak had no interest in the truth. Plaintiff submitted a request for the medical report on Enness' physical examination, if there was one. He also asked Novak to retrieve the MSP report from the interview with Enness and to ask when Plaintiff would be interviewed by the MSP.

On September 20, 2009, Plaintiff was called for his administrative hearing. After the hearing, Plaintiff was found guilty of the charge. Novak had not provided the hearing officer with

the MSP report or the physical examination results, as requested by Plaintiff.  Plaintiff provided a statement by prisoner Robinson, who averred that he had witnessed Enness being drunk and had not heard anything that would indicate a sexual assault.  Officer Cheatham declined to offer a statement, but Officers Mosier, Reed and Anderson gave statements to the effect that Enness had not mentioned to them anything about the sexual assault.  The hearing officer, relying in part on certain confidential statements, found Plaintiff's denial of the assault to be self-serving and not credible.

When Plaintiff subsequently had an opportunity to speak with Novak on October 1, 2009, Novak informed Plaintiff that no MSP reports existed and no rape kit had been completed. On October 16, 2009, Plaintiff was transferred to level 5 at Marquette Branch Prison.  He was informed by the Security Classification Committee that he had been labeled a Homosexual Predator in the MDOC database.

Plaintiff appealed the hearing determination to the Hearings Administrative Division. His appeal was denied on November 23, 2009.  On January 28, 2010, Plaintiff filed a petition for judicial review.  His case was dismissed on February 22, 2010 because it was filed more than 60 days after the decision of the Hearings Administrative Division.  Plaintiff has since complained to the Ombudsman, the Department of Civil Service, the Correctional Facilities Administration, the MDOC Director, the MBP and IBC Wardens, the Governor, and various outside agencies.  He obtained no assistance.  Warden Prelesnik responded to an inquiry from the American Friends Service Committee, indicating that a rape kit had been collected, but it was destroyed after Enness refused to cooperate with the investigation.

Plaintiff alleges that Defendant Ball was deliberately indifferent to Plaintiff's reputation, health and safety by failing to protect him from being easily targeted.  He alleges that Defendant Kincaid was deliberately indifferent to his safety by failing to thoroughly investigate

prisoner Enness' allegations of sexual assault.  Plaintiff also alleges that Defendants Novak and Kincaid conspired and engaged in corrupt practices by conducting an inadequate violation, thereby denying Plaintiff's rights to procedural due process under the Fourteenth Amendment as well as his rights under the Eighth Amendment.  Finally, Plaintiff alleges that Defendants Kincaid and Novak violated Plaintiff's right to equal protection when they believed the white accuser over Plaintiff, who is African American.

For relief, Plaintiff seeks compensatory damages, declaratory relief, and an injunction lowering his classification level back to level 2.

## Discussion

### I.  Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 129 S. Ct. at 1949.  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## A.     Eighth Amendment

Plaintiff alleges that Defendants Ball and Kincaid were deliberately indifferent to his need to be protected from further false accusations and other potential risks to his safety after Plaintiff was falsely accused by Jason Elliott.

The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596,

600-01 (6th Cir. 1998).  The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted).  Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, directing that they may not use excessive physical force against prisoners and must also "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)).  To establish liability under the Eighth Amendment for a claim based on a failure to prevent harm to a prisoner, a plaintiff must show that the prison officials acted with "deliberate indifference" to a substantial risk that another prisoner would cause the prisoner serious harm.  *Farmer,* 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 32 (1993); *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001); *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996); *Taylor v. Mich. Dep't of Corr.* 69 F.3d 76, 79 (6th Cir. 1995).

The deliberate-indifference standard has an objective and a subjective component. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 32.  To satisfy the objective component, a plaintiff must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.* The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind . . . ." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834).  Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*  Under *Farmer*, "the official must

- 8 -

both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Plaintiff's allegations fall far short of demonstrating that any Defendant was deliberately indifferent to a risk that another prisoner would cause Plaintiff serious harm. Indeed, none of the facts alleged by Plaintiff suggest that Plaintiff was ever at risk of serious physical injury or other harm. The mere fact that Plaintiff might have his reputation impugned and be subjected to taunting does not rise to the level of a serious risk of harm. Moreover, the risk that another prisoner would make a false allegation simply because one had been made in the past was far from obvious. Plaintiff therefore fails to meet the objective component of the Eighth Amendment test. In addition, Plaintiff does not even allege that any Defendant possessed the requisite subjective intent. In fact, Plaintiff's own allegations demonstrate that Ball did not have a sufficiently culpable state of mind in refusing to transfer Plaintiff. Ball told Plaintiff at that time that he believed that any likelihood of a subsequent incident or other risk to Plaintiff was low. As a consequence, Plaintiff fails to demonstrate either prong of the Eighth Amendment standard.

Moreover, to the extent that Plaintiff intends to allege that his placement in segregation amounts to cruel and unusual punishment, his claim again fails to state a claim. Placement in segregation is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. at 347; *see also Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *2 (6th Cir. May 4, 1999). Although it is clear that Plaintiff was denied certain privileges as a result of his administrative segregation and subsequent placement in level 5 housing, he does not allege or show that he was denied basic human needs and requirements. The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative

segregation cannot establish an Eighth Amendment violation. *See Evans v. Vinson*, No. 09-6283, 2011 WL 2579779, at *5 (6th Cir. June 29, 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008).

Finally, absent physical injury, a plaintiff's claim for emotional injuries is barred by 42 U.S.C. § 1997e(e), which precludes any claim by a prisoner "for mental or emotional injury suffered while in custody without a prior showing of physical injury." *Id. See also Harden-Bey*, 524 F.3d at 795-96; *Taylor v. United States*, 161 F. App'x 483, 486-87 (6th Cir. 2007); *Jarriett v. Wilson*, 162 F. App'x 394, 400 (6th Cir. 2005). Plaintiff alleges no physical injury. As a consequence, his claim for emotional damages is barred.

For all these reasons, Plaintiff fails to state an Eighth Amendment claim against any Defendant.

### B.    Due Process

Plaintiff alleges that he was deprived of due process by Defendants' failure to adequately investigate Enness' allegations, which resulted in Plaintiffs being falsely convicted of the major misconduct of sexual assault and being reclassified to a higher security classification. A prisoner's ability to challenge a prison misconduct conviction depends on whether the conviction implicated any liberty interest. In the seminal case in this area, *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Court prescribed certain minimal procedural safeguards that prison officials must follow before depriving a prisoner of good-time credits on account of alleged misbehavior. The *Wolff* Court did not create a free-floating right to process that attaches to all prison disciplinary proceedings; rather the right to process arises only when the prisoner faces a loss of liberty, in the form of a longer prison sentence caused by forfeiture of good-time credits:

- 10 -

It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison.  But here the State itself has not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious misbehavior.  Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest."  But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.

*Wolff*, 418 U.S. at 557 (citations omitted).

Plaintiff does not allege that his major misconduct convictions resulted in any loss of good-time credits, nor could he.  The Sixth Circuit has examined Michigan statutory law, as it relates to the creation and forfeiture of disciplinary credits[1] for prisoners convicted for crimes occurring after April 1, 1987.  In *Thomas v. Eby*, 481 F.3d 434 (6th Cir. 2007), the court determined that loss of disciplinary credits does not necessarily affect the duration of a prisoner's sentence.  Rather, it merely affects parole eligibility, which remains discretionary with the parole board.  481 F.3d at 440.  Building on this ruling, in *Nali v. Ekman*, 355 F. App'x 909 (6th Cir. 2009), the court held that a misconduct citation in the Michigan prison system does not affect a prisoner's constitutionally protected liberty interests, because it does not necessarily affect the length of confinement.  355 F. App'x at 912; *accord, Wilson v. Rapelje*, No. 09-13030, 2010 WL 5491196, at * 4 (E.D. Mich. Nov. 24, 2010) (Report & Recommendation) (holding that "plaintiff's disciplinary hearing and major misconduct sanction does not implicate the Fourteenth Amendment Due Process Clause"), *adopted as judgment of court*, 2011 WL 5491196 (Jan. 4, 2011).  In the

---

[1] For crimes committed after April 1, 1987, Michigan prisoners earn "disciplinary credits" under a statute that abolished the former good-time system.  Mich. Comp. Laws § 800.33(5).

- 11 -

absence of a demonstrated liberty interest, Plaintiff has no due-process claim based on the loss of disciplinary credits. *See Bell v. Anderson*, 301 F. App'x 459, 461-62 (6th Cir. 2008).

Even in the absence of a protectible liberty interest in disciplinary credits, a prisoner may be able to raise a due-process challenge to prison misconduct convictions that result in a significant, atypical deprivation. *See Sandin v. Connor*, 515 U.S. 472 (1995). Plaintiff has not identified any atypical or significant deprivation arising from his conviction. The *Sandin* Court expressly concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005). Moreover, the Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim*, 461 U.S. at 245; *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976). As a consequence, because his prison misconduct conviction did not result in an extension of the duration of Plaintiff's sentence or some other atypical hardship, his due-process claim fails. *Ingram v. Jewell*, 94 F. App'x 271, 273 (6th Cir. 2004).

Finally, even if the Court were to assume that Plaintiff had a liberty interest in the misconduct charge and conviction, it is clear that Plaintiff received due process of law.[2] In all cases

---

[2] In *Wolff*, the Supreme Court held that, when a prison disciplinary proceeding implicates a liberty interest, it must meet minimal due process requirements by (i) giving inmates advance written notice of charges at least 24 hours prior to the disciplinary hearing; (ii) allowing the inmate to call witnesses and present documentary evidence in the inmate's defense; and (iii) providing the inmate with a written statement of evidence relied on by the disciplinary board and the reasons for the disciplinary action. *Wolff*, 418 U.S. at 563-69. The right to call witnesses or present evidence, however, is not absolute. *Id.* at 566. Instead, it must be balanced against the prison's need to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority. *Id.* Plaintiff does not dispute that he was given notice of the proceeding and a written and reasoned decision. Moreover, in addition to two statements by Plaintiff, the evidence before the hearing officer included answers from numerous officers and other witnesses to questions posed by Plaintiff. (*See* App'x B to Compl., docket #1-2, Page ID#42.) Plaintiff therefore clearly was allowed to present evidence in his own behalf. As a result, even if Plaintiff could show that he had a liberty interest in his misconduct conviction, he clearly received all of the process to which he was entitled.

where a person stands to be deprived of his life, liberty or property, he is entitled to due process of law.  This due process of law gives the person the opportunity to convince an unbiased decision maker that, for example, he has been wrongly or falsely accused or that the evidence against him is false.  The Due Process Clause does not guarantee that the procedure will produce a correct decision.  "It must be remembered that even if a state decision does deprive an individual of life, [liberty], or property, and even if that decision is erroneous, it does not necessarily follow that the decision violated that individual's right to due process." *Martinez v. California*, 444 U.S. 277, 284 n.9 (1980).  "[T]he deprivation by state action of a constitutionally protected interest in "life, liberty or property" is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original).

For all of these reasons, Plaintiff fails to state a procedural due process claim.

## C.    Equal Protection

Plaintiff alleges that he was deprived of his right to equal protection under the Fourteenth Amendment because the story told by Enness, a white man, was believed over the story told by Plaintiff, an African American man.  He also alleges that the incident was not investigated fully because of racial bias, as evidenced by the fact that all of the people involved in the investigation and decisionmaking, as well as the complaining witness, were white.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike.  U.S. CONST., amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Plaintiff's allegations on this point are wholly conclusory.  He merely states that he is being treated differently because he is African

- 13 -

American and all of the investigators and complaining witness were white. Plaintiff provides no specific factual allegations to support his contention, nor does he identify any similarly situated white person charged with sexual assault who was treated differently. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 129 S. Ct. at 1949-50; *Twombly*, 550 U.S. at 555.

### Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed for failure to state a claim pursuant to 28 U.S.C. § 1915A(b) and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $455.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.

Dated:  May 29, 2012                          _____/s/ Gordon J. Quist_____
                                                                GORDON J. QUIST
                                                    UNITED STATES DISTRICT JUDGE

- 14 -